Travonza Bobbitt et al. 24-13016. And, Mr. Barron, you may proceed to the podium. I see that you have reserved five minutes for rebuttal. Thank you, Your Honors, and may it please the Court, my name is Ken Barton, and along with Deborah Gomez, we are here on behalf of Plaintiff Christopher Mathis, or Christopher Bonner, who is representing his father's estate in this case. As this Court said, let the law declare that every man's pleading shall embrace a full and clear statement of all matters of fact which he's required to prove and no other. That was this Court in Wheelan v. Palm Beach County in 2015, citing a Georgia justice going back to 1886. And so what is this case really about? Well, I asked the Court to simply review the first submitted complaint, the complaint in this case. It describes an epidemic of violence in Georgia prisons, an epidemic where numerous victims, survivors, people who simply have died in Georgia prisons due to understaffing, due to the lack of mental health care that they're required to put forward. What about the fact that our case, our McDowell case, says it can't rely on a general policy of understaffing? Yes, Your Honor, and in this instance, it's really about the totality of the circumstances. And we try to set that forth throughout our responses to the motions to dismiss. But it's not just about the understaffing, it's about the lack of mental health services, it's about the facilities at issue. So, Counsel, I've taken the opportunity that you've offered to read the entire amended complaint, word for word, all of it. And if you look at the allegations, it's interestingly phrased and pled with regard to the mental health, and I bring that up there. So I've read all the mental health allegations and the substantive part of the complaint. And in there, it continually talks about inmates often will have this, or these will rarely be provided to the prisoners, or these folks are often not available. But what I don't see are specific allegations for your client was deprived of these things. And I think that, if you look at what, if you read the district court's order, which was long and lengthy, and I think took seriously the allegations here, the district court himself said, the district court judge himself said, there doesn't seem to be a connection between these things, which for our purposes, the terror taken is true, and your client. And so that, can you address that for me? Yes, your honor. And I think it's especially important to note that this is, we're here on a motion to dismiss. We are. We're not after discovery. There's been no discovery. And this is one of those instances which this court talked about, I believe it was in Scott versus Miami-Dade County, the challenges that arise in prisoner lawsuits, especially when there's the death of someone. And we made the allegations that these facilities, these conditions damaged Mr. Mathis before he passed away. Of course, there was no discovery in this case, and so we would think that that would be developed. But there has to be some allegation that he was subject to these things. I know there is certainly a general allegation that these things happened and he, and they let, they caused his death. But there has to be some plausible allegation that he was subject to them. Let me just give you a flavor of what I'm talking about. So, I'm looking at paragraph 67. This is at docket entry 37 at page 17. For mental health counselors who are assigned at GSP, they rarely have interactions with the inmates they are supposed to and have a duty to serve and treat. The only location in which purportedly consists of mental health treatment is this one particular location. The flavor that I'm talking about here is, so, sorry, paragraph 67, same page. It is not uncommon for individuals at GSP who have long been prescribed and taking medication to be deprived of them, and so on and so forth. It just, there doesn't seem to be the connection between that my client was deprived of all of these things, my client didn't see a doctor, or his roommate who killed him and who was being prosecuted for that crime didn't do these things. Well, we certainly believe that's true, that the same treatment that individuals in these different units experience was also the case for Mr. Mathis, of course. Well, you have to know, okay, let's start with the end because I think it's easier. Mr. Mathis died, right? That's correct, Your Honor. Did he die because he was placed in the double bunk cell and should have been placed in the single cell where he gets mental health treatment? Yes, Your Honor. Is that what it is? Okay. So, let's start with that, and who made the decision to place Mr. Mathis in the tier? Because, see, a lot of these cases have all kinds of issues about qualified immunity, who does what, but we got to get the facts straight. That's why I start with the worst thing for Mr. Mathis, right? He died, who caused the death, because things happen, because we're not here on the general prison, right, which I think has been closed, right, in any event. So that problem has been kind of resolved for the prison. We're here for Mr. Mathis, for the son of Mr. Mathis, Mr. Bonner, apparently, right? So do you have any facts about who did what to whom, which officer? That's kind of what I wanted to hear about. Yes, Your Honor, and we certainly understand that the First Amendment complaint is lengthy and we attempted to provide what each of these individual defendants, their part in the process of approving Mr. Mathis to be in this unit, but just for example, Commissioner Ward, who's the first named defendant, it was his responsibility to approve Mr. Mathis's placement in this specific unit at issue. The same thing is true of the statewide mental health director, Dr. Jackson, along with the warden of the prison. They all had a specific part in this, and we cited to the policies of the Georgia Department of Corrections to show what individual part each one of these defendants had. So everyone who's placed in a double bunk, since the other person could be a violent prisoner, that would be an automatic 1983 violation? I wouldn't say that, but, you know, we allege, and we talk about the policy where there's supposed to be a specific justification that's provided if inmates are placed in a double bunk, and these are supposed to be approved, I believe it's by some of the top leadership. There's no doubt that you've alleged policy violations. There's no doubt about that, but that doesn't get you to a constitutional violation. In other words, what ceiling GDOC has placed on itself is not the floor of what the Constitution requires. And so the question I have is, how did that, where is it plausibly alleged that those things caused what happened here, either something happened for your client or got put in a known danger because of what was going on with the cellmate? And I think the answer to that is that the way that we use the policies to describe what happened, either these individuals, the defendants, followed the policy, and thus they were involved in this decision to place Mr. Mathis in this unit and in this program, or GDC did not follow their policies, and we would argue that's equally problematic. But here's the problem, too, is that there was a specific threat directed at Mr. Mathis. He's taken out of that situation and placed in a room with an inmate that there, at least as far as the complaint is concerned, there's no allegation that there was any knowledge that Mr. Johnson, the one who murdered Mr. Mathis, was a threat. So how did any prison official have knowledge that putting him with Mr. Johnson was going to cause harm to Mr. Mathis? And Your Honor, I will acknowledge that is the problem that we encounter in this case, and I think going back to Scott versus Miami-Dade County, we learned after the fact, after this case had already been dismissed, that Mr. Johnson had literally cut off a part of another person's nose two days before he killed Mr. Mathis. That was within the knowledge of the individual defendants. The problem is, though, and you talk about this in your brief, so we're aware of it, and it is disturbing. But it's not in the complaint, and I don't blame, you're right. You're inherently behind the eight ball on this stuff, it's hard. The law has made a very high burden on plaintiffs in these cases, and so we understand that and acknowledge that. There is no blame here at all. But we're constrained, the district court is constrained by the allegations in the complaint. And as I can tell, and this is going to Judge Branch's question, where was there an indication for the prison officials that putting these two together was going to lead to the result here? Yeah, even without the fact that Mr. Johnson had had this incident a couple days earlier, it's important to note that both of these individuals, Mr. Mathis and his attacker, were both placed in this Tier 2 program for a specific reason, whether it was mental health reasons or because they had displayed, you know, prior violent tendencies. The problem is, though, that or is a big deal. Because violent tendencies might be one thing, but, I mean, people have mental health problems all the time, and that is inherently wrong to put two people with mental health problems in a cell together. I imagine our prisons are filled with people with mental health problems. How does that put people on notice that that's going to result in one roommate taking the other's head, smashing it against the metal bed, you know, causing him to die? Well, I think under the circumstances, it's the culture that's in this prison, in Georgia that happened previously in an epidemic of violence. And the fact that, again, individuals should have been in a single cell bunk or single cell unit without specific justification, there was a reason for that policy because of the inherent danger involved with these, with this population of individuals. And so, you know, we believe on the totality of the circumstances that are alleged in the case of all this. And thank you. You do have five minutes for a rebuttal. Thank you. Mr. Thompson, and I see that you are going to take 12 minutes and share your time. That is correct, Your Honor. May it please the Court. To pick up on where the bench and my colleague on the other side left off, I think there are three fundamental problems with this complaint that Your Honors have already discussed this morning. The first is that the way this complaint is put together— Does it make any difference which count? There are three counts, right? Yes, Your Honor. Which one do you think is the most shotgun count of the three? So the— Pick one, two, or three. Which one? I think count number one— I know you're going to say all of them. Count one. And then what's the next one? So I think— That is shotgun, general, not sufficiently specific. I think count three is— You're right. So count two is the one that is weakest for you, right? So in terms of— So tell me about that one. So in terms of linking defendants to counts, I agree that count two does the best job of that, but it has other problems. So Mr. Bonner has not cited a single case from this Court in which the mere fact of understaffing at a prison was a justification for holding supervisors individually liable under 1983 in the Eighth Amendment, much less the other defendants in this case. And there's a good reason for that, which is when you have these kind of failure to hire, failure to supervise claims, that's supervisory liability, which this Court has said is an extremely rigorous standard. And unlike in the cases Mr. Bonner cites on page 26 of his brief, which are all unsuccessful failure to supervise claims, a pure failure to staff claim is not one in which even a supervisory prison official is in complete control of the situation. So I just want to—you understand—sorry to jump in, but I just want to understand. Your response to Judge Marino's question is not that this is a shotgun complaint. What you're saying is we should just look past that and on the merits find that there's a failure to state a claim for supervisory liability. Your Honor, I—correct. I recognize that there is some conceptual overlap between what this Court has called the fourth sin of shotgun pleading, which is a failure to link defendants to particular claims, and a failure to state a claim as against those individual defendants under Rule 12b-6 in 1983. And here the district court did both, and so we could essentially just rule for all defendants that there's just a failure to state a claim with regard to each of the counts, but you were talking about count two right now. That is absolutely correct. This Court can affirm on either ground. I think it's important that defendants be on notice of whether they are implicated by allegation of unconstitutional conditions or treatment in a prison. And so the State is not shying away from the— It's certainly helpful when we are directed to make individualized determinations that— Correct. —allegations be individualized. But let me jump ahead to the merits here of a failure to state a claim. Sure. So what your opposing counsel has argued is, GDC-wide, there were—I think it's 83, I may be missing the number, but I think 83 deaths in a two-year period, that there were at least five that are specifically acknowledged in the one-year period at GSP. And three of them were inmate-on-inmate violence. Do I have that about right? I think that is all correct, Your Honor. I would clarify one thing, and this kind of goes to a fundamental problem with this complaint, is that it is—he used the phrase epidemic of violence, his brief uses the phrase generalized conditions. He's attempting to put the institution on trial instead of these individual defendants, and I represent the individual defendants. And let me—let me kind of— But some of them may have died because of an illness, you're saying, or what? I'm taking the allegations in the complaint at face value. Mr. Bonner's claims are all about conditions, treatment, protection in Tier 2 of GSP. There is only one allegation of a death, it's almost a year before his death, that occurs in Tier 2 that is attributable to inmate-on-inmate violence. So just so I understand what you're saying here, because I think I follow you, that the causation part of the substance of his allegation is everything that came before it caused my death at Tier 2. In other words, the allegation is the understaffing that I have talked about in the unit I was in at the time led to what caused my death. And so what has to be for supervisory liability is understaffing in his unit. And the only allegation of understaffing in his unit that happened prior to his own that's alleged in the complaint is one. There are two others that are inmate-on-inmate, but he specifically says, I don't know where the unit was. In fact, Your Honor, unless I'm mistaken, the sole allegation of inmate-on-inmate violence that occurred in Tier 2 prior to his death has no link to understaffing. Only one of his allegations involving a death in this area has any connection to understaffing. I will say, I probably think it's fair to read it as alleging that, but I guess my question is, under Craig and our other supervisory liability cases, is any required to show more than one instance in order to show the kind of custom and policy that would implicate supervisory liability? It must be rampant and continuous. And this Court has described that as a very high standard because we want to be cautious about using the Eighth Amendment and Section 1983 to assign supervisory liability when the essence of these kind of claims is deliberate indifference by the individual who is best situated to solve the problem, to prevent the deprivation before it occurs. And this is true of Count 2. Count 1, there was some discussion of Count 1 during the previous argument. I mean, Count 1 is just a mismatch for the doctrine. Count 1 is saying there are these conditions that other inmates, not Mr. Mathis, are suffering. I will say this. It seems to me that Count 1, and I'm asking this, I'm not telling, it seems to me that Count 1 is focused on the things that he was subjected to in general before he was moved to Tier 2 and his death. And the failure of staffing and the deliberate indifference and failure to protect deal with what happened that led to his death. So is that a fair reading of the complaint? I think it would be, I don't, I'm not, I don't think so. And I think this is clearest from Mr. Mouner's appellate briefs. And that is where he needed to kind of clarify what his complaint was up to. And ideally before that, but yes. Of course. But on page 14 of his reply, he describes that kind of the gravamen of all his claims is generalized conditions of dangerousness in Tier 2. Now, I think there's another problem with the summary you provided, which is that if you, if you look at page 31 and 32, the reason I ask, and I'm sorry to jump in, but the reason I ask is one of the allegations in count one, the conditions of confinement count, are unsanitary conditions. That has nothing to do with what led to, at least in sort of a direct way, what led to his death. But still, if, assuming they were unconstitutionally unsanitary, he would have been damaged from the time he was in an unsanitary cell until the time that he passed away. That is a cognizable injury for which he would be entitled to damages. I think that's correct. I don't think it was quite clear until his, until his reply brief how he was thinking about count one. And I think he makes it clear on page 31 and 32 of the opening brief and then in the whole reply brief that what he's getting at. Is this an amended complaint or the first complaint? The amended complaint. And should he, A, be given another opportunity to amend? I mean, there were a lot of paragraphs, but you're saying they're too general. Did he seek that out or not? And the judge denied it or? I don't think there's any indication that he sought another opportunity to amend. But if he had, he should have been given a second opportunity or a third, I guess. If we're talking about. Do you agree with that? If we're talking about count one, I don't think there's any way he could have amended these allegations to fit a conditions of confinement claim. Because it's one of the. How about the other counts? I would provide the same answer on those as well. I simply, I don't think it's a failure of information. I don't think it's about not quite precisely linking up. I think the problem is that these, the fundamental claim he's making is that the prison is a dangerous place and that Mr. Mathis was killed by another prisoner. The problem is there's no connective tissue between those and the defendants in this case. So the conditions. I want to go back to the conditions of confinement case, conditions of confinement claim. The district court treated it as sort of three parts in its totality. I'm not sure that's a fair reading of the complaint, but that's what the district court did. One was the solitary or administrative segregation. Two was the sanitary conditions. And three was adequacy of mental health. Is that a condition of confinement? Have you, do you have any indication of whether the failure to receive adequate mental health treatment, whether for him or for his cellmate, is a sort of understood as a condition of confinement like solitary or not having bathrooms and stuff like that? This kind of goes to the novelty of count one. So no is the answer to your question. I think that should be a deliberate interference claim under the kind of medical treatment line of cases under 1983 in the Eighth Amendment. What he's trying to stitch together with these three conditions, and you can see this on page 32 of his opening brief, that it created the conditions possible for a third party to kill Mr. Mathis. So the submission in count one is that all of these three things together affected other inmates in a way that made them more violent. Does he have standing to allege conditions of confinement that affected somebody else?  And that gets to what I think count one is doing. It is, what it really is, is a claim of dangerous conditions under a failure to protect theory under cases like Purcell and Marbury that essentially the prison has descended into a state of nature and therefore you can get liability because there's just kind of constant violence. Which he makes in count three. I think it's not clear from the complaint, but I think why he's putting this in count one is because conditions of confinement doesn't have that same causation element. I have to say, I read count one more as a sort of pseudo-class action on behalf of those who were serving at that time. Maybe I'm being too generous. I think that is one way to read it. I think another way to read it is it is a version of a dangerous conditions failure to protect claim because it's not fundamentally about what Mr. Mathis endured in terms of  conditions. It is that these conditions made it a riskier place to live. And we know that from the passive voice in which he articulates some of these things. Correct. Correct. It is a generalized conditions and that's the phrase he uses throughout his brief. It's clear in his reply brief where he says, it doesn't matter what title you give this claim. The district court got it wrong because the conditions are so terrible. With the time you have left, I want to talk quickly about count three. So he alleges, his best allegation on count three is this guy was violent. He was much bigger and younger than I was. And he's in tier two, which indicates as a matter of policy that he has some significant stuff going on with him. And these past incidents have happened. Not with him, but others in tier two. And so because of that, I should have been protected, especially where I had already indicated then that I was threatened by other folks at the prison. So I think there are a number of problems with that. The last thing your honor mentioned about the previous threats, I don't think that can enter into the equation in a meaningful way because the only thing he told the guards and the officials at the prison was that he was facing threats from people in the F dormitory, which is not in tier two. He was then moved into tier two for his protection and that's where the incident occurred. So I think we can set that aside. On the attributes of Mr. Johnson that are in the complaint, I think our best case for that is probably Carter, where this court explained the violent nature inside and outside of prison, indications that the person was not simply designated as having mental health problems, but was acting in ways that suggested that they were experiencing mental health problems in that moment that were brought to the attention of guards by the plaintiff was not enough to establish even an objective risk under failure to protect, much less that we have allegations of deliberate indifference that, as your honor pointed out earlier, are connected to the individuals at the prison. There's no indication of any defendant making the decision to place Mr. Mathis in a cell with Mr. Johnson with knowledge of Mr. Johnson's attributes that could add up to eighth amendment liability. Thank you, Mr. Thompson. Thank you. Mr. Hannafield. Hannafeld. My name is Paul Hannafield. I represent Dr. Javelle Jackson, who is the statewide mental health director. I would like to start with what your honors were talking about earlier, about the mental health care, because that clearly comes between my client, who's the director of mental health care at GDC. The fatal flaw of the plaintiff's argument in that regard is that, like Judge Luck was saying, he did not make a deliberate indifference to medical care claim. But it, and I will say it's not as clear as it maybe should be, but if the allegation is that my cellmate was not receiving the, A, had mental health problems because by definition he was in this cell and in this area, B, the mental health conditions at this hospital were such that they were just routinely not provided, and C, this person who was mentally ill and not providing care injured me, doesn't that get to a claim against him for lack of mental health care provided at the prison? None of those allegations are in the complaint. I think some of them are plausibly read there. I mean, there are certainly significant allegations that inmates are generally not given the care that they are, that GDC requires, and it is alleged that this guy was in the Tier 2 dorm, which categorically meant he had these issues, and they were put together. I mean, those are alleged in the complaint. There's no allegations that Mr. Johnson was failing to get mental health treatment at this facility, nor was there any allegations that Mr. Mathis was failing to get mental health treatment at this facility. So the key missing link is linking those general allegations to any of the two that were in that cell? Absolutely. Yes, Your Honor. And like the 11th Circuit recently, like this court recently clarified, in inaction cases where liability is based on defendant's failure to act, the relevant risk needs to be inextricably tied to the defendant's own conduct in Wade versus McDade. That is not here, and that is exactly what you said. That nexus is not there. Any other questions? Thank you, Your Honors. Thank you, Mr. Hennefeld. Mr. Barton, you have five minutes. Thank you, Your Honor. You know, we acknowledge there's certainly things that we don't know right now. We don't know how some of these specific decisions were made, but we try to overcome that by alleging what the policy says and what the procedures say and who should have made those decisions and what Dr. Jackson's... Did you ask the judge to give you permission to amend the complaint? That was allowed... Did you try to narrow it down or expand it with more information about Johnson or something else? The court ordered, allowed plaintiff to amend after the first round of motions to dismiss. We were not given that opportunity after the second. Did you ask, though? I do not believe that we did, specifically. Did you do a public records request before filing the complaint for medical records for your client? Yes, that's correct. We asked for... We asked the Georgia Department of Corrections for Mr. Mathis's entire inmate file. There were some documents that were provided, but they were heavily redacted. There were many documents that were not provided under certain exceptions, and we don't argue about whether those were proper denials under the Georgia Open Records Act. And this wouldn't be the forum to do that anyway. Right, right. But it's the problem that prisoners have in these situations of being able to prove these claims. But still, going back to the pleading standards, we believe that we plausibly alleged each one of these claims. So with specific regard to understaffing... Can you give me the elevator pitch for your conditions of confinement claim? Yeah, I think the court, and some of the questions hit the nail on the head, is that we know, or we've alleged, that Mr. Mathis was indeed injured by the conditions prior to his death. Indeed, we don't have all the details. There's been no discovery. But the fact that he was in these conditions in a certain unit without a mattress and without shoes... It was the ACU unit, right? Correct, correct, Your Honor. And so we know that there was damage prior to his death. What was that? That would be developed in discovery. So you agree that the Count 1 is only for what I'll call pre-Violent Act conduct that your client was subject to from the moment he was sort of transferred out of the F-Dorm until the incident happened. Is that fair? Well, I think both that, but also the conditions that led to the situation where Mr. Mathis was killed. But that would bear on... The problem is that would seem to bear on his cellmate, not him. In other words, I'm with you like every step before the incident, but at the time of the incident, if you're saying, well, the conditions were so bad it made him go crazy, I'm just not sure that you can allege at least conditions of confinement as for someone else's behalf. That's his injury that the conditions were so bad it drove him crazy, but I just don't see how that's your injury. But maybe I'm wrong on that. Do you have any law that suggests that you can bring that kind of claim because of what conditions did to a third party? I've just never heard of it before. I think it's more of a factual issue, and indeed, maybe this is an issue for summary judgment after discovery has been developed. I think the court is correct that Mr. Mathis was indeed injured, and we allege that he was injured prior to his death. Did those conditions lead to the actual incident that led to his death? That would be developed in discovery, but I think it's adequately pled in the complaint. And so... Well, I think you say it's adequately pled in the complaint. I think it is pled in the complaint that the conditions of confinement caused injury, created the conditions possible for a third party to take the life of Mr. Mathis. I'm not following that link from unsanitary conditions to the loss of Mr. Mathis's life. So, I agree, you have a paragraph about it. I think whether or not that is sufficiently pled is another issue. Yes, Your Honor, we understand. We argued that it's the totality of the circumstances, so not just the unsanitary conditions, but also the understaffing, the fact that correctional officers are not making these routine rounds, including three of the named defendants who were on duty that evening. They didn't find Mr. Mathis until several hours later. But how does that plausibly allege that the incident would not have happened? How does that cause? I mean, certainly he would have been found sooner after it happened, but how is not doing every 30 minute or hour rounds in the dormitory at night would have changed what happened here? That's the link that I'm having trouble with. Had there been proper supervision, presumably this would not have occurred in the first place. Had there been someone on duty there in that unit, as they should have been. But again, we think that would be developed further in discovery. The simple fact is that this case really, you know, I said go back to the complaint, but this really is about the motion to dismiss standards and the fact that you have survivors and you have victims who are being denied access to this legal system over these sorts of hurdles. And so we implore this court to reverse the decision of the district court and allow this matter to proceed below. Thank you, Mr. Barton. Thank you for your time. Thank you all. We have your case under advisement and court is adjourned.